Julie **LAYNA**, Plaintiff,

v.

**COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,** Defendant.

Civil No. 96–1620–JO.

United States District Court, D. Oregon.

July 1, 1997.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Claimant Julie K. Layna seeks judicial review of a final decision of the Commissioner of the Social Security Administration [1] denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (SSA).

This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3). Following a careful review of the record, I uphold the Commissioner's decision.

### ADMINISTRATIVE HISTORY

Claimant filed an application for SSI on April 5, 1993 and for DIB on May 17, 1993.

The SSA denied the applications initially and on reconsideration.

Claimant timely requested a hearing before an Administrative Law Judge (ALJ), which was held on July 7, 1994. Claimant appeared and was represented by counsel. She testified at the hearing, as did her daughter, Dawn Nida; her domestic partner, Peter Sully; and the vocational expert (VE), Robert A. Male, Ph.D. On September 1, 1994, the ALJ issued a decision denying claimant's applications, determining that claimant was not disabled within the meaning of the Social Security Act.

Claimant applied to the Appeals Council for review of the ALJ's decision, but the Council declined review. As a result, the ALJ's decision became the final decision of the Commissioner.

Claimant then appealed to the district court. On January 17, 1996, Magistrate Judge Coffin filed Findings and Recommendation reversing the ALJ's decision and remanding this case to the SSA. The Magistrate found that the ALJ failed to include in his hypothetical to the VE the limitations that claimant's treating physician noted. The district court adopted Magistrate Judge Coffin's Findings and Recommendation on February 6, 1996.

On remand, the ALJ held another hearing on June 17, 1996. Claimant appeared and was represented by counsel. She testified at the hearing, as did the VE. The ALJ again denied claimant's applications for benefits on August 29, 1996, concluding that claimant retains the residual functional capacity to return to her prior work as a data entry clerk. As such, claimant is not disabled within the meaning of the Social Security Act and not entitled to DIB or SSI.

Claimant again applied for review to the Appeals Council, but the Council declined review. As a result, the ALJ's decision became the Commissioner's final decision. Claimant now asks the court to review the ALJ's 1996 decision.

---

1. John J. Callahan has replaced Shirley Chater as Commissioner of the Social Security Administration. References to the commissioner in this opinion reflect that change.

**816**

## SUMMARY OF ALJ

The Social Security Administration evaluates disability claims which are evaluated according to a five–step procedure. *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991); *see* 20 C.F.R. §§ 404.1520 and 416.920. The ALJ applied this five–step evaluation procedure to claimant's factual situation. First, the ALJ determined that claimant had not engaged in substantial gainful activity since March 21, 1992.

Second, the ALJ concluded the medical evidence established that claimant has fibromyalgia, irritable bowel syndrome, and adjustment disorder with mixed emotional features. The ALJ then determined that these were severe impairments within the regulations' meaning.

Third, the ALJ determined that claimant's impairments did not meet or equal the criteria of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (1996).

Fourth, the ALJ assessed claimant's ability to perform her past relevant work. The ALJ determined that claimant's statements concerning her impairments and their impact on her ability to work were not entirely credible in light of the treating and examining practitioners' reports. He found that claimant lacks the residual functional capacity (RFC) to lift and carry more than 20 pounds or more than ten pounds on a regular basis, to stand for more than an hour or walk for more than half an hour, to sit for more than two hours, or to do any firm grasping or firm manipulating. The ALJ further determined that in her past work as a data entry clerk, as generally performed in the national economy, claimant was not required to lift more than 10 pounds or remain on her feet for prolonged periods. The ALJ concluded that claimant's past relevant work as a data entry clerk did not require her to work in ways precluded by her medically determinable impairments, and, therefore, that claimant's impairments did not prevent her from performing her past relevant work.

Because the ALJ determined that claimant's impairments do not prevent her from performing her past relevant work, he did not need to reach the fifth in the evaluation procedure, which would be to establish claimant's ability to perform other work that exists in the national economy. Nevertheless, in the first administrative hearing, the ALJ posed a hypothetical to the VE that included claimant's past work history and Dr. Sager's report of claimant's limitations. The VE testified that "two hours fits the normal time frame for breaks ..., where a person would get about a 15–minute break every two hours. In the world ... these days, [they're] finding it's better for people that do data entry [to] take a break every hour." The VE concluded that claimant's restrictions would not preclude her from her prior work as a data entry clerk.

Claimant's counsel then posed a different hypothetical to the VE. This hypothetical included claimant's allegations of problems regarding headaches, nausea, vomiting and dizziness which could occur three to four days a week; the need to elevate her feet above her heart two to three times a day for 20 minutes at a time on a "bad" day; muscle weakness and fatigue, with the result that the hypothetical claimant would have difficulty in reaching for things and be prone to drop objects; her experience with "good days and bad days" that might result in her not showing up to work some weeks and missing two or three days on other weeks; and, on bad days, her need for substantially more periods of rest or breaks throughout the day. The VE testified that such a person as described in this hypothetical could not do the past relevant work of the claimant "on a sustained basis."

In the second administrative hearing, the ALJ also posed a hypothetical to the VE that including the limitations that claimant's treating physician, Dr. Sager, reported, especially claimant's possible future problems with frequent absences. The VE noted "there [are] some ... tacit contradiction[s]" in Dr. Sager's reports of whether claimant is disabled based on objective medical findings. Based on Dr. Sager's entire report, the VE concluded that "an individual might be able to get a job, but would [not] be likely to keep [it] for ... any regular or reasonable period of time, because of the increased absences, fatigue, perhaps reduced performance lev-

els." Claimant's counsel had no questions for the VE.

Because claimant could perform her past relevant work, the ALJ concluded that claimant is not under a disability, as defined in the Social Security Act, and is not entitled to DIB or SSI payments.

## FACTS

Claimant was born July 26, 1950. She alleges disability since March 21, 1992 due to fibromyalgia and arthritis in her hands and lower back. At the time claimant applied for DIB and SSI, she was 42 years old.

Claimant has a tenth grade education.[2] She has worked as a data entry clerk, inventory clerk, and materials handler. However, claimant has not engaged in any substantial gainful activity since March 21, 1992.[3] Claimant remains insured for Social Security purposes through at least December 31, 1997.

Claimant's disability claim stems from a motor vehicle accident that occurred on March 22, 1992, in which a car hit her driver's side and rolled her car. The X-ray report from the hospital where she was treated stated that "the papaspinal soft tissues are unremarkable. . . . There are minimal degenerative changes in the mid thoracic spine . . . [and] a mild thoracic scoliosis."

The next day, Dr. Lyles, claimant's treating physician from June 1991 to August 1993, saw claimant for cervical and thoracic spine strain. Dr. Lyles prescribed pain medication—Vicodan and Cyclobenzaprine—and claimant missed work due to her lack of concentration while taking that medication.

Dr. Lyles also treated claimant in follow-up visits. Claimant complained of continuing pain in her back and shoulders and bad headaches. Nevertheless, Dr. Lyles released her to work half-time on April 4, 1992. However, claimant's employer, Gerome Manufacturing, was not willing to take her back unless she had returned to her "baseline condition." On April 21, 1992, Dr. Lyles reported that:

> [claimant] is very discouraged—company won't take her back to work until I say she's completely normal and [the] insurance company won't pay since she's released to return to work. Patient has difficulty sleeping, still has tension headaches. She missed yesterday's [physical therapy] appointment because she didn't know she had one. Has no money to buy medication.

On September 23, 1992, Dr. Lyles diagnosed claimant with fibromyalgia and depression. In an October 12, 1992 follow-up appointment, Dr. Lyles confirmed the fibromyalgia diagnosis and noted that claimant had a recurrent right wrist ganglion cyst.

On April 9, 1993, Dr. Lyles saw claimant for an alleged sore tailbone. Dr. Lyles wrote in a May 28, 1993-letter that claimant has "fibromyalgia and depression causing multiple aches and pains and insomnia." Dr. Lyles stated that:

> [claimant] did not tolerate two antidepressants I prescribed for her and said she could not afford more expensive ones. It is difficult to know how much physical activity [claimant] could tolerate because of her co-existent [sic] depression. I suspect she would tolerate a sedentary job best, she doesn't tolerate prolonged standing, lifting, [or] carrying. She should be able to sit, listen, speak and travel without difficulty.

On August 4, 1993, Dr. Lyles saw claimant for pain in her legs and lower back. Dr. Lyles recommended an aerobic pool exercise program and continued to prescribe various

---

**2.** There is some discrepancy in the record regarding claimant's education level. In the first hearing with the ALJ, claimant testified that she had completed the "12th grade" and had a high school degree. In the second administrative hearing, on June 17, 1996, claimant testified she only had a tenth grade education. The ALJ deemed this second testimony to be the truth because the issue was not relevant to his decision.

**3.** The ALJ noted that "although [claimant] obtained work in May 1992 as a flagger, this was an unsuccessful work attempt since it ended after two months, allegedly because (claimant) was unable to tolerate the prolonged standing involved."

medications to aid in alleviating claimant's pain. Dr. Lyles also referred claimant to a rheumatologist regarding her fibromyalgia.

Dr. Sager, the rheumatologist, saw claimant on April 27, 1993. He noted that she had "chronic widespread musculoskeletal pain and tender points consistent with the fibromyalgia syndrome." Claimant reported "up to 20 years of widespread musculoskeletal pain, progressing over the last three years to significantly interfere with activities of daily living and work tolerance." However, all the medical tests that Dr. Sager gave—including radiographs of her S1 vertebrae and hands—showed no clear indication of claimant's alleged arthritic condition.

Dr. Sager also filled out a "Physical Functional Impairments/Limitations Report" check box form. He indicated that claimant could sit for one to two hours at a time, stand for one hour at a time, walk for half an hour at a time, and drive for one hour at a time. He also indicated claimant could frequently lift and carry zero to 20 pounds and occasionally lift and carry 21 to 74 pounds. Finally, he indicated that claimant could use her hands for repetitive movements such as simple grasping, but could not do so for firm grasping or firm manipulating.

On July 7, 1994, Dr. Sager answered a questionnaire that claimant's attorney had prepared regarding claimant's condition and functional capacity. He indicated that signs and findings established by medically acceptable clinical or laboratory diagnostic techniques confirmed claimant's fibromyalgia. Moreover, Dr. Sager indicated that he relied on claimant's reports of pain, fatigue, shortness of breath and other subjective symptomatology in deciding what course of treatment to use. Dr. Sager indicated that whether claimant is disabled based on objective medical findings is "undetermined." Alternatively, Dr. Sager also responded that the objective evidence reasonably confirms that the severity of the alleged symptoms arises from claimant's medical condition. He qualified his answer by stating "but this is nonspecific." In addition, Dr. Sager indicat-

ed that claimant's "dysfunction level is very subjective."

Dr. Sager then concluded in the questionnaire that claimant is not disabled based on objective medical findings. However, he also indicated that claimant's condition would be reasonably expected to cause variations in her ability to function on a daily basis and could "make work more difficult." He estimated these variations would likely result in frequent absences from work at a rate exceeding 12–18 days per year.

On June 22, 1993, John Gruntner, M.P.H., M.S.W., performed a psychological evaluation of claimant. Claimant stated that "in general her mood is positive." She scored an eight on the Beck Depression Inventory, "indicating there is no significant depression." [4] Mr. Gruntner's diagnostic impression of claimant was an adjustment disorder with mixed emotional features. He opined that claimant did not to appear to be disabled due to a mental or emotional condition.

On July 7, 1994, Ms. Layna's previous employer, Gerome Manufacturing, noted claimant's job—performing data entry as an Inventory Control Clerk—requires claimant to stand and/or walk for 2–4 hours per day and to lift 0–10 pounds on a daily basis. In addition, Gerome Manufacturing reported that claimant had demonstrated "work avoidance behavior prior to her illness/injury."

### STANDARD OF REVIEW

 This court may set aside the Commissioner's denial of disability insurance or SSI benefits only if the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir.1991). Substantial evidence is "more than a scintilla," but "less than a preponderance." *Id.* Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.*

 A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physi-

---

4. Even if depression has been diagnosed, Dr. Sager stated in his July 7, 1994 questionnaire that "depression ... plays a role, but [is] not the cause of pain."

cal or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the burden of establishing disability. *Swenson v. Sullivan,* 876 F.2d 683, 687 (9th Cir. 1989).

## DISCUSSION

Claimant challenges the ALJ's decision on several grounds: 1) the ALJ used the wrong form to evaluate claimant's mental impairments; 2) the ALJ erred by partially rejecting claimant's testimony without giving clear and convincing reasons for the rejection; 3) the ALJ erred by rejecting the findings of Dr. Sager, one of claimant's treating physicians; and 4) the ALJ failed to properly evaluate claimant's residual functional capacity and her ability to perform past work. I address these arguments in turn.

## I. Proper Evaluation of Claimant's Mental Impairments by ALJ

■ Claimant alleges that the ALJ used the wrong form to evaluate her mental impairments, arguing that he erred in not using the "Mental Residual Functional Capacity Assessment" form (SSA 4734–F4–SUP) [hereinafter MRFCA]. Social Security regulations require the ALJ to "do a residual functioning capacity [RFC] assessment," 20 C.F.R. § 416.920a(c)(3), and to use "[a] standard document." *Id.* § 416.920a(d). *See also* 20 C.F.R. § 404.1520a(c) & (d).

Neither regulation specifies what "standard document" the ALJ must fill out to assess a severe mental impairment. The ALJ completed an OHA Psychiatric Review Technique (PRT) form and attached it to both of his opinions. The PRT form documents factors that evidence claimant's disorder and rates claimant's impairment severity—including function limitation and degree of limitation.

5. In an unpublished opinion, the Ninth Circuit held that the use of a PRT form met the requirements of 20 C.F.R. § 404.1520a (1987). *Halper v. Shalala,* 46 F.3d 1141, 1995 WL 15621 at *3 (9th Cir.1995). ALJs, however, must also discuss in their opinions the evidence they considered in reaching the conclusions expressed on the form. *Id.*

No Courts of Appeal have addressed this issue in a published ruling.[5] However, this district has recently held that "the PRT form, and not the RFC, is the *standard document* referred to in the regulation." *Sims v. Chater,* Civ. No. 96–150–HA Opinion, at 8 (D.Or. Feb. 11, 1997). In addition, the court in the *Sims* case required the ALJ to document in his decision what evidence he considered in completing the form. *Id. Sims*'s additional documentation requirement is consistent with the Social Security Administration's interpretation of these regulation requirements. *See* SSR 96–8p.

■ I join the other judges in this district by holding that an ALJ may meet the RFC assessment requirements by attaching a completed PRT form to his decision and by documenting in his opinion the evidence he considered in completing the PRT form.

Moreover, the ALJ in this case met these requirements. First, the ALJ evaluated claimant's medical disposition in accordance with the PRT Form's enumerated categories. The ALJ determined that claimant had presented sufficient evidence to establish "Affective Disorders." Under the subcategory of Affective Disorders, the ALJ evaluated claimant as having a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: ... Other: Adjustment disorder with mixed emotional features." In addition, under the evaluation of Functional Limitation and Degree of Limitation, the ALJ rated claimant as follows:

Slight ... restrictions to activities of [her] daily living; slight ... difficulties in maintaining [her] social functioning; seldom ... [has] deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere); and never ... [has] episodes of deterioration or decom-

However, Ninth Circuit Rule 36–3 provides that unpublished dispositions are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel. Therefore, *Halper v. Shalala* does not control here.

pensation in work or work–like settings which cause the [her] to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

Furthermore, the ALJ documented in his decision the evidence he considered in completing the PRT form. He stated that:

[The] treating physician Yvonne M. Lyles, M.D., reports that the claimant has fibromyalgia and depression, causing multiple aches and pains and insomnia. Dr. Lyles adds that it is difficult to know how much physical activity the claimant could tolerate because of her coexistent depression. [Dr. Lyle] suspects that [claimant] would tolerate a sedentary job best ... [and] should be able to sit, listen, speak and travel without difficulty.

The ALJ also evaluated the John Gruntner's June 1993 mental health evaluation of claimant. The ALJ noted:

[C]laimant reported a relatively unremarkable psychiatric history. She appeared to be discouraged and negatively effected by pain and fatigue from her fibromyalgia. However, there were no major mood problems and there was no evidence of anything like a psychosis. It did not appear that she was disabled due to any mental or emotional condition. She exhibited relatively mild problems with memory and concentration but no major difficulties in those areas.

Overall, the ALJ determined that the medical evidence on record establishes that claimant has only mild problems with fibromyalgia and adjustment disorder. Therefore, the ALJ met the RFC assessment requirements by completing the PRT form and documenting in his decision, relying on substantial evidence, his considerations in completing the form.

## II. Partial Rejection of Claimant's Testimony

■ Claimant alleges that the ALJ erred in discounting her subjective pain testimony. In general, the Ninth Circuit has stated that an ALJ must perform a two–step analysis before rejecting a claimant's subjective symptom testimony: "the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). *See also Cotton v. Bowen,* 799 F.2d 1403 (9th Cir.1986). The court explained the *Cotton* test as follows:

Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...." *Bunnell [v. Sullivan,* 947 F.2d 341, 344 (9th Cir.1991) (en banc)] (quoting 42 U.S.C. § 423(d)(5)(A) (1988)); *Cotton [v. Bowen,* 799 F.2d 1403, 1407–08 (9th Cir.1986)]. The *Cotton* test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Smolen,* 80 F.3d at 1281–82.

■ "If the claimant produces evidence to meet the *Cotton* test and there is no evidence of malingering, the ALJ can reject claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen,* 80 F.3d at 1281 (citing *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir.1993)). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Id.* at 1284. However, in determining that subjective testimony is not credible, the ALJ may rely on:

(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treat-

ment; and (3) the claimant's daily activities.

*Id.* (citations omitted).

■ The Ninth Circuit has emphasized that when an ALJ rejects a claimant's testimony about excess pain, the ALJ must fully articulate specific reasons for refusing to credit that testimony. *Gonzalez v. Sullivan,* 914 F.2d 1197, 1201 (9th Cir.1990); *Varney v. Secretary of Health & Human Services,* 859 F.2d 1396, 1398 (9th Cir.1988) (citations omitted). Nor can an ALJ discredit excess pain testimony simply because it is out of proportion to the medical evidence. *Id.*

Claimant alleges that persistent pain in her back and legs keeps her on pain relievers and in a chair with a heating pad for most of the day. The constant pain makes it hard to walk or bend her legs. She complains of poor eyesight causing eye strain and, consequently, headaches. Claimant testified that she needs to take two to three pain pills just to be up and around during the day, and then takes more at night to rest. She also claims to become fatigued easily and complains of dizziness, nausea, and vomiting. Claimant alleges that she takes 2–3 naps per day for 20–45 minutes intervals and additional breaks of 15–30 minutes to put a heating pad on her back and a pillow behind her neck. She also complains of difficulty with concentration, speaking, and remembering instructions. In addition, she gets "cranky" when she gets tired and "wouldn't get along with anybody." She rated her ability to maintain punctuality and attendance as "bad."

Claimant reported that her daughter comes over daily to clean, and someone usually assists claimant in cooking and doing her hair. Claimant testified that out of an eight–hour day at a sit–down–job, she could spend 1–2 hours sitting before having to take a break. She has both good days and bad days. A bad day means "a lot of fatigue, pain, being cranky, [and] having an attitude problem." She claims to have bad days 80% of the time.

The ALJ accepted that claimant had limitations from her fibromyalgia that would limit some of her abilities. He acknowledged claimant's limitations to include an inability to lift and carry more than 20 pounds or more than ten pounds on a regular basis, to stand or walk for more than an hour, to sit for over two hours or to do any firm grasping or firm manipulating. However, the ALJ concluded that claimant's past work as a data entry clerk did not require the performance of work functions that her medically determinable impairments precluded.

Moreover, the ALJ accepted claimant's pain testimony insofar as it was consistent with the uncontradicted medical records presented into evidence. The ALJ discounted claimant's pain testimony beyond what the medical records supported because of her lack of credibility. The ALJ concluded that claimant's "statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the reports of the treating and examining practitioners." He specifically discredited claimant's testimony of profound fatigue, incapacitating muscle pains, daily headaches and a nearly bed–bound existence as not comporting with the medical evidence of record. Further, he concluded that the medical records did not mention any of claimant's alleged dizziness, nausea or vomiting, nor did claimant present any evidence to document her alleged arthritis or her alleged need to elevate her feet above heart level two to three times daily for up to 20 minutes.

In addition, the ALJ noted that claimant testified that she swam and did some of her own housework, contradicting her alleged limitations. Also, the ALJ stated that "[claimant] has an over 20–year history of widespread musculoskeletal complaints, during most of which time she has been able to work at a series of sedentary to medium level jobs." Finally, the ALJ noted that claimant had several discrepancies in her testimony that affected her overall credibility. The ALJ thus stated specifically which symptom testimony was not credible and what facts in the record lead to that conclusion. Therefore, the ALJ gave clear and convincing reasons for partially rejecting claimant's subjective symptom testimony.

### III. Rejection of Findings by Claimant's Treating Physician—Dr. Sager

■ Claimant alleges that the ALJ erroneously discounted Dr. Sager's findings.

The Ninth Circuit distinguishes the opinions "of three types of physicians: (1) those who treat the claimant (treating physician); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). "As a general rule," moreover, "more weight should be given to the opinion of a treating physician than to the opinion of a nonexamining physician." *Id.* (citations omitted). Thus, "where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons." *Id.*

■ The Ninth Circuit has upheld the decision of an ALJ to reject a doctor's opinion when other evidence—such as laboratory test results, contrary reports from examining physicians, claimant's testimony, and medical records—besides another doctor's opinion supports the rejection. *Id.* Moreover, when a claimant has more than one treating physician, the ALJ can choose to accept the substantiated opinion of one or more of them over the unsubstantiated opinion of another, especially if claimant fails to explain why one physician's opinion should be preferred. *Burkhart v. Bowen*, 856 F.2d 1335, 1339–40 (9th Cir.1988).

■ In addition, the treating physician's opinion is not "necessarily conclusive as to either a physical condition or the ultimate issue of disability." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ need not accept an opinion which is "brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion." *Id.*

No party in this case challenges the existence of claimant's severe impairments—fibromyalgia, irritable bowel syndrome, and adjustment disorder with mixed emotional features. Instead, the issue before the ALJ was the extent to which claimant's impairments cause significant vocationally relevant limitations—that is, whether claimant is disabled due to these severe impairments.

The ALJ "discredited a cursory check-off form" that claimant's attorney prepared and Dr. Sager answered. As the ALJ noted, Dr. Sager contradicts himself in answering the questions regarding if claimant is disabled based on objective medical findings. Dr. Sager stated both that based on objective medical evidence claimant is "not disabled" and that the "evidence reasonably confirms the severity of claimant's alleged symptoms arising from her medical condition."

Moreover, as the ALJ found, Dr. Sager's report does not refer to objective findings on clinical examination of claimant, nor does it refer to any supportive laboratory diagnostic studies; Dr. Sager acknowledges that claimant's "dysfunction level is very subjective"; Dr. Sager states that claimant is not disabled based on objective medical findings; and Dr. Sager relied on claimant's subjective reports of symptoms in arriving at his treatment course. The ALJ reasoned:

Although Dr. Sager responds affirmatively when asked if the objective evidence reasonably confirms that the severity of the alleged symptoms arises from the claimant's medical condition, he qualifies his answer with the statement, "but this is nonspecific." Regrading the alleged need for the claimant to lie down and rest intermittently during an 8 hour work day, Dr. Sager responds "undetermined—possibly." Because Dr. Sager explicitly and exclusively bases his opinion on the claimant's reported symptoms, the validity of which is highly questionable as noted . . . , it is rejected as being inconsistent with the evidence as a whole.

Moreover, the ALJ noted that Dr. Lyles, one of claimant's treating physicians, determined claimant to not be disabled. The ALJ reported that Dr. Lyles "suspect[ed] that [claimant] would tolerate a sedentary job best because she does not tolerate prolonged standing, lifting or carrying. [But] that claimant should be able to sit, listen, speak and travel without difficulty."

Dr. Lyles' medical opinion contradicts Dr. Sager's opinion. Thus, the ALJ could choose to accept either Dr. Lyles' or Dr. Sager's medical opinion. *See Burkhart*, 856 F.2d 1335, 1339–40 (9th Cir.1988).

Therefore, the ALJ gave Dr. Sager's opinion ample weight in his decision and was within his authority to not accept Dr. Sager's full medical opinion regarding claimant's disability status. The ALJ gave clear and convincing evidence for his decision, and thus I uphold that decision.

## IV. Evaluation of Claimant's Residual Functional Capacity and Ability to Perform Past Work

 Claimant argues that the ALJ erred in not performing a proper residual functional capacity (RFC) assessment because the hypothetical that the vocational expert (VE) addressed did not contain all of her limitations. "The RFC assessment must be based on all of the relevant evidence in the case record." SSR 96–8p. An RFC is described as:

> an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work–related physical and mental activities.

*Id.*

 "Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant." *Magallanes v. Bowen,* 881 F.2d 747, 756 (9th Cir.1989) (citations omitted). "The testimony of a vocational expert is valuable only to the extent that it is supported by medical evidence." ' *Id.* at 756 (quoting *Sample v. Schweiker,* 694 F.2d 639, 644 (9th Cir.1982)). However, it is not the vocationalist's role to determine the validity of the medical opinion(s) offered. *Sample,* 694 F.2d at 644. "This function is uniquely within the ambit of the ALJ, and the limitation of evidence contained in the hypothetical at issue would be objectionable only if the assumed facts could not be supported by the record." *Id.*

 addition, "the ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel." *Magallanes,* 881 F.2d at

756 (citing *Martinez v. Heckler,* 807 F.2d 771, 773(9th Cir.1986)). "Rather, the ALJ is 'free to accept or reject these restrictions . . . as long as they are supported by substantial evidence.' " *Id.* "The limitation of evidence in a hypothetical is objectionable 'only if the assumed facts could not be supported by the record.' " *Magallanes,* 881 F.2d at 757 (citing *Sample,* 694 F.2d at 644).

In this case, the ALJ determined what evidence was relevant to determine claimant's limitations and restrictions that would affect her ability to perform her past relevant work activities. The ALJ found that claimant lacks the capacity to lift and carry more than 20 pounds or more than ten pounds on a regular basis, stand or walk for more than an hour, sit for over two hours, or do any firm grasping or firm manipulating. The ALJ rejected claimant's subjective pain testimony because it was not credible based on all the medical records and claimant's daily activities. Thus, the ALJ established the RFC assessment by substantial evidence based on the whole record.

 The ALJ discredited Dr. Sager's report in his decision by clear and convincing reasons. The ALJ found Dr. Sager to have relied on claimant's subjective reports in arriving at his treatment. In addition, the ALJ noted that Dr. Sager's report contained contradictions and was conclusory in nature. Moreover, the record did not support Dr. Sager's report. Thus, a hypothetical based on that report carries no evidentiary weight.

 The ALJ also found that claimant's subjective testimony was not entirely credible and justified his decision with clear and convincing reasons based on the record as a whole. The ALJ is not bound to accept the restrictions claimant's counsel posed to the VE in the first administrative hearing. Thus, the ALJ properly excluded pain and fatigue from the hypothetical.

 The ALJ found that claimant's alleged mental impairment was not disabling and did not significantly affect claimant's ability to work. Thus, the ALJ properly excluded claimant's mental impairment from the hypothetical.

Finally, the ALJ found that claimant's irritable bowel syndrome would not significantly affect her ability to work. Therefore, he did not include it in the hypothetical posed to the VE in the second administrative hearing.[6]

## CONCLUSION

Based on review of the record, substantial evidence supports the ALJ's conclusion that claimant was capable of performing her past relevant work. Accordingly, the ALJ's decision to deny disability benefits is AFFIRMED.

---

**6.** Claimant was not diagnosed with irritable bowel syndrome until September 1995. This new diagnosis occurred after the first administrative hearing on September 1994.

In addition, claimant's counsel did not pose a hypothetical to the VE in the second hearing. Thus, claimant's counsel did not raise the issue of irritable bowel syndrome is a limitation in determining claimant's residual functional capacity.